IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| LYMARI GRACIANO, | ) | CIV. NO. 11-00432 SOM/KSC |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING SUMMARY |
| | ) | JUDGMENT WITH RESPECT TO THE |
| vs. | ) | FAILURE TO PROMOTE AND PUBLIC |
| | ) | POLICY CLAIMS, AND DENYING |
| HAWAII PACIFIC UNIVERSITY, | ) | SUMMARY JUDGMENT WITH RESPECT |
| | ) | TO RETALIATION CLAIM |
| Defendant. | ) | |
| _____ | ) | |

**ORDER GRANTING SUMMARY JUDGMENT WITH RESPECT TO THE
FAILURE TO PROMOTE AND PUBLIC POLICY CLAIMS, AND
DENYING SUMMARY JUDGMENT WITH RESPECT TO RETALIATION CLAIM**

I.        INTRODUCTION.

Plaintiff Lymari Graciano claims that Hawaii Pacific University ("HPU") discriminated against her based on race when it failed to promote her, and when it terminated her after she complained about race discrimination.  Graciano also asserts a claim of discrimination in violation of public policy.

HPU seeks summary judgment.  The court grants summary judgment with respect to the claim of failure to promote in Count I and the claim of discrimination in violation of public policy in Count III of the Complaint.  But the court denies summary judgment with respect to the retaliation claim asserted in Count II of the Complaint.

II.        **SUMMARY JUDGMENT STANDARD**.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). See Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000). The movants must support their position that a material fact is or is not genuinely disputed by either "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials"; or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial. See id. at 323. A moving party without the ultimate burden of persuasion at trial--usually, but not always, the defendant--has both the initial burden of production and the

ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).

The burden initially falls on the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted).

The nonmoving party may not rely on the mere allegations in the pleadings and instead must set forth specific facts showing that there is a genuine issue for trial. T.W. Elec. Serv., 809 F.2d at 630. At least some "'significant probative evidence tending to support the complaint'" must be produced. Id. (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968)); see also Addisu, 198 F.3d at 1134 ("A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."). "[I]f the factual context makes the non-moving party's claim implausible, that party must come forward with more

3

persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." Cal. Arch'l Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co., 475 U.S. at 587). Accord Addisu, 198 F.3d at 1134 ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

In adjudicating summary judgment motions, the court must view all evidence and inferences in the light most favorable to the nonmoving party. T.W. Elec. Serv., 809 F.2d at 631. Inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. Id. When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." Id.

## III.        FACTUAL BACKGROUND.

It is undisputed that, in October 2008, Graciano was hired by HPU, a private institution, to be a Grants Manager in HPU's Office of Sponsored Projects ("OSP"). Graciano was to help with general grant administration, which included maintaining a database of all information needed to meet reporting requirements. She was also supposed to coordinate review and

4

submission of grant proposals, as well as work with grant

recipients to maintain post-award records.  See ECF No. 27-4.

The Grants Manager position description required the

following education and experience:

> A Bachelor's Degree in Accounting; knowledge
> of continually changing regulations
> pertaining to the management of sponsored
> projects; demonstrated working knowledge of
> sponsored project accounting and reporting
> functions, including sponsor expenditure and
> reporting requirements, federal Cost
> Accounting Standards, GAAP; federal agency
> processes, federal and state laws and
> regulations governing grants, OMB A-21, A-133
> . . . [;] experience in both the pre-award
> and post-award states of grants management
> and; ability to supervise and motivate
> professional and administrative support
> staff; and 3 year's experience in university
> grants administration.

ECF No. 27-4.

Before being hired for the Grants Manager position,

Graciano interviewed with John Kearns, the Vice President of

Academic Affairs, and Martha Sykes, the person in charge of OSP.

See Deposition of Lymari Ophelia Graciano taken Jan. 19, 2012, at

84, ECF No. 27-2.  At the time of the interview, Sykes had

already announced that she was resigning effective May 31, 2009.

Id. at 84-86.  Claire Cooper, the former Associate Vice President

of Human Resources at HPU, says that it was Kearns who hired

Graciano for the Grants Manager position.  See Declaration of

Clair Cooper ¶ 5, May 2, 2012, ECF No. 28; Plaintiff's Concise

Statement ¶ 2, ECF No. 33.

5

Graciano sought a promotion to Sykes's old position as Director of OSP.  A position description set forth the minimum qualifications for that position: "Bachelors Degree in Business Administration, Accounting, Public Administration or equivalent . . . Ability to multi-task in a complex, time sensitive environment[.]  Strong knowledge of federal, state and other applicable regulations[.]  At least five (5) years directly related experience leading a sponsored research office."  ECF No. 27-5.

In connection with her application to be the OSP Director, Graciano submitted a resume indicating that she had received a "Bachelor of Liberal Arts" from Harvard University, cum laude, in "Social Science Economics" in 2005.  See ECF No. 27-8 and 32-32.  In a letter to the search committee for the position, Graciano stated that she had a "Bachelors Degree in Economics."  See ECF No. 32-10.  Graciano had also apparently told people at HPU that she had an undergraduate degree in Economics.  See ECF No. 32-6 (April 28, 2009, letter or reference from Martha Sykes stating, "With her background in economics (a BS in Economics from Harvard University) . . . Ms. Graciano is well qualified to enter the MBA program at Hawaii Pacific University"); ECF No. 32-7 (April 28 2009, letter of reference from Dr. John Kearns that stated, "Ms. Graciano's undergraduate degree was in Economics").

6

Graciano indicated in her deposition, however, that she had a degree in Social Science and had taken only one economics class.  See Graciano Depo. at 12-13.  As Graciano puts it, "Economics is a class that I took that was closest to the job description."  Id. at 13.  In other words, Graciano had misstated her educational background.[1]

HPU indicates that a search committee evaluated the candidates and that the OSP Director position was offered to the

---

[1]Lymari Graciano's misrepresentation about having a degree in Economics may cast doubt on her credibility at trial. Although the court makes absolutely no credibility determination here, the court recognizes that all of Graciano's academic credentials might be scrutinized.  For example, Graciano's resume indicates that she earned a "Bachelor of Liberal Arts."  That appears to be a degree offered by the Harvard Extension School, which appears to be part of Harvard University, but the evidence as to Graciano's major appears to be limited to her own representations.  See http://www.extension.harvard.edu/ degrees-certificates/undergraduate-degrees/degree-requirements/ba chelor-liberal-arts-requirements (last visited July 24, 2012).

The court also notes that Graciano's potential damages may be limited if HPU would have fired her had it known her resume and/or application overrepresented her economics background. See, e.g., Miranda v. Costco Wholesale Corp, 1996 WL 571185, *7 (D. Or. May 7, 1996) (holding that, when a defendant establishes that an employer improperly discriminated against the plaintiff, the after-acquired evidence doctrine may bar certain remedies); Redden v. Wal-Mart Stores, Inc., 832 F. Supp. 1262 (N.D. Ill. 1983) (holding that, because Wal-Mart would have discharged the plaintiff upon finding out that he had lied on his resume, he was not entitled to any relief under Title VII); see also O'Day v. McDonnell Douglas Helicoptor Co., 79 F.3d 756, 759 (9th Cir. 1996) (noting in an Age Discrimination in Employment Act case that, when a plaintiff establishes discrimination, after-acquired evidence that would have caused the employer to terminate the plaintiff may bar front pay and reinstatement and may limit back pay to the period starting with the date of the discriminatory act through the date the after-acquired evidence was discovered).

candidate who had the highest ranking, who was not Graciano. That person did not accept the position. <u>See</u> Cooper Decl. ¶ 11. HPU says that the position was then left unfilled. <u>Id.</u> Kearns was part of the search committee for the OSP Director position.[2] <u>Id.</u> ¶ 11.

Graciano says that it was actually Sykes who was in charge of choosing her replacement as OSP Director, not a search committee. <u>See</u> Affidavit of Lymari O. Graciano ¶ 2, May 21, 2012, ECF No. 26-2. Graciano says that Sykes "deliberately gave less weight to criteria that matched up with [Graciano's] qualifications, which artificially reduced [her] overall rating." Graciano Aff. ¶ 5.

Instead of hiring an OSP Director, HPU ultimately created a new position--Associate Vice President of Sponsored Research. <u>See</u> Cooper Decl. ¶ 12. As with the OSP Director position, the Associate Vice President of Sponsored Research position required: "Bachelors Degree in Business Administration, Accounting, Public Administration or equivalent . . . Ability to

---

[2]At the hearing on the present motion, counsel for HPU represented that Andy Brittain, Kathleen Clark, and John Kearns were the members of the search committee for the OSP Director position. Counsel's representation was based on statements made at page 5 of Linda K. Kreis's Report of Investigation dated December 9, 2009. No affidavit or declaration establishes who was on the search committee, and HPU does not explain how the statements in Kreis's report about the makeup of the committee are admissible for the purpose of proving the truth of the matter. Kreis, having been hired as an outside investigator, presumably had no personal knowledge about the committee.

multi-task in a complex, time sensitive environment[.]  Strong
knowledge of federal, state and other applicable regulations[.]
At least five (5) years directly related experience leading a
sponsored research office."  ECF No. 27-6.

      HPU hired Dr. Carolyn Weeks-Levy as its Associate Vice
President of Sponsored Research.  Cooper says that Weeks-Levy had
a doctorate in Microbiology and experience obtaining patents.
See Cooper Decl. ¶ 12.  According to Weeks-Levy's resume, she
received a Bachelor of Science degree in Biology with an emphasis
in Microbiology.  She also received a Ph.D in Microbiology and
Molecular Biology.  See ECF No. 32-15.  Weeks-Levy had been the
Chief Executive Officer (2007-08) and Chief Science Officer and
Vice President (2006-07) of Hawaii Biotech Inc., managing 40 to
55 scientists and handling a budget of $20 million per year.  See
ECF No. 32-15.  There appears to be no dispute that it was Kearns
who hired Weeks-Levy.  See ECF No. 27-10 (Graciano's race
discrimination complaint to HPU, which indicates that "John
Kearns filled the position with a white woman").

      Graciano says that in June 2009, before Weeks-Levy was
hired, she noticed that Sykes's "pre-award files" were missing.
See Graciano Aff. ¶ 9.  Graciano says she reported this to
Kearns, who allegedly told her to do the best she could to
recreate the files.  See id. ¶¶ 9-10.

According to Graciano, she was told on July 21, 2009, by Kathy Clark that Clark needed to approve all of Graciano's reports because Clark did not have confidence in Graciano's ability to do her job.  See Graciano Aff. ¶ 14.

The discussion at that meeting with Clark allegedly included concern about communication between Graciano and Mei Wang, to whom Graciano's reports were to be submitted. Apparently, Graciano thought Clark had told Wang not to speak to Graciano.  Id. ¶¶ 14-16.  Graciano says that Kearns looked into this allegation and determined from speaking with Clark that Graciano had intimidated Wang.  Graciano says that she asked Kearns whether he believed Clark, and that Kearns responded, "Yes, because [Wang's] Asian and that's how Asian girls are." Id. ¶ 17.

Graciano says that, after Sykes left HPU, Clark changed one of the grant-related forms, forcing Graciano to complete business expense forms by hand rather than computer.  Id. ¶ 19. Graciano says that Clark then told Graciano that forms could no longer be completed by hand.  Id. ¶ 20.

Moreover, Graciano says, no one told her that certain codes had been changed effective July 1, 2009.  That meant that, when she submitted certain forms with the old codes, payment of expenses for the grants Graciano had been working with was delayed.  Id. ¶ 21.

10

Graciano says that, on September 8, 2009, Weeks-Levy's first day of work, Graciano told Weeks-Levy that Sykes had taken or destroyed certain files and that the school's Information Technology department had been unable to retrieve them from Sykes's computer. See Graciano Aff. ¶ 23.

On or about October 9, 2009, HPU received a discrimination complaint in which Graciano claimed to have been the victim of race discrimination. Graciano claimed that Kearns had hired Weeks-Levy, a white woman, to be the OSP Director even though Weeks-Levy had not applied for the position. See ECF No. 27-10. Graciano also complained that "Kathy Clark has constantly been going out of her way to try to prove that [Graciano is] unqualified for [her] present job." Id.

HPU hired Linda Kreis, an equal employment opportunity consultant, to look into Graciano's complaint of race discrimination. See Cooper Decl. ¶ 15. On or about December 9, 2009, Kreis issued her "Report of Investigation." See ECF No. 27-12. Kreis noted that Graciano was Puerto Rican. Id. at 19. Kreis concluded that Graciano had not suffered race discrimination when she was not selected as OSP Director because no one was selected for that position. Instead, Weeks-Levy was selected for the different position of Associate Vice President of Sponsored Research. Id. at 21. Kreis's report indicates: 1) that Weeks-Levy had originally applied to be President of the

Oceanic Institute; 2) when she was not selected for that
position, HPU discussed the OSP Director position with her;
3) Weeks-Levy was apparently not interested in the position as
posted; and 4) after some negotiation, the job title and
description were altered, expanding duties and creating a "higher
status" position.  See ECF No.27-12 at 20.  Kreis concluded that
Graciano was also "not better qualified than Dr. Weeks-Levy for
that position."  Id. at 22.  Kreis also concluded that Kathy
Clark had treated everyone in the same negative way, meaning that
Clark's treatment of Graciano was not based on race but rather on
Clark's disagreeableness with everyone.  Id.

        On December 1, 2009, Weeks-Levy asked Graciano for all
documents concerning one of the grants Graciano had managed.
Graciano Aff. ¶ 36.  Apparently, Weeks-Levy had received an email
telling her that HPU was delinquent in submitting a report
concerning the grant.  See ECF No. 27-13 at 10.  Graciano gave
Weeks-Levy an email dated August 31, 2009, which showed that the
report had been submitted.  However, Graciano failed to give her
a second email dated October 19, 2009, which noted that the
report needed to be corrected.  Id.  Graciano later explained
that, because the grant account had been transferred to Mei Wang,
she assumed that Wang had been handling the matter.  Id. at 12.
Graciano conceded that she possibly forgot about the email.  Id.

Sometime later that month, Weeks-Levy "raised concerns about potential misconduct by Graciano, including false accusations . . . that Dr. Sykes had destroyed certain grant files and the failure by Graciano to disclose that a grant-related financial report . . . had been rejected by the funding agency." Cooper Decl. ¶ 16.

Jan Boivin, an HPU EEO officer, investigated Weeks-Levy's concerns. See Cooper Decl. ¶ 16. On January 15, 2010, Boivin determined that Graciano had falsely accused Sykes of destroying files. Boivin determined that this false accusation violated HPU Conduct Guidelines 2.1.30 ("Inappropriate, unprofessional, or illegal conduct") and 2.1.2 ("Falsification or dishonesty in any form"). Boivin also determined that the false accusation violated HPU Conduct Guideline 2.1.23 ("Malicious conduct or action with the intent to disparage the University, its employees, and/or the quality of its services; disloyalty to the University"). See Confidential Memorandum at 9-10, ECF No. 27-13; HPU Employment Handbook, General Conduct Guidelines, ECF No. 27-14.

Boivin also determined that Graciano had falsely represented to Weeks-Levy that a financial award had been submitted and was complete when she knew that a report regarding it still required attention and correction, another violation of HPU Conduct Guidelines 2.1.2, 2.1.23, and 2.1.30. Id. at 13.

13

HPU says that, based on Boivin's findings, Kearns terminated Graciano.  See Cooper Decl. ¶ 17.  On January 27, 2010, Cooper sent Graciano a letter informing her that she was being terminated.  See ECF 27-15.

IV.     **ANALYSIS.**

Count I of the Complaint in the present action asserts that HPU violated Title VII when it failed to promote Graciano and hired Weeks-Levy instead.  At paragraph 119, Count I further alleges that the failure to promote violated 42 U.S.C. § 1981.

Count II asserts that HPU retaliated against Graciano by conducting sham investigations and ultimately firing her after she complained about race discrimination.

Count III asserts a violation of Hawaii's public policy against discrimination.

The Complaint does not assert any claim under chapter 378 of Hawaii Revised Statutes.

**A.    Count 1--Failure to Promote.**

Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  Under 42 U.S.C. § 1981, race discrimination is prohibited in general:

> All persons within the jurisdiction of the
> United States shall have the same right in
> every State and Territory to make and enforce
> contracts, to sue, be parties, give evidence,
> and to the full and equal benefit of all laws
> and proceedings for the security of persons

14

and property as is enjoyed by white citizens,
and shall be subject to like punishment,
pains, penalties, taxes, licenses, and
exactions of every kind, and to no other.

On this motion for summary judgment, Graciano may
establish race discrimination in two ways.  She may produce
direct or circumstantial evidence demonstrating that a
discriminatory reason more likely than not motivated the
employer.  See Surrell v. Cal. Water Serv. Co., 518 F.3d 1097,
1105 (9th Cir. 2008).  Alternatively, she may apply the burden-
shifting analysis set forth in McDonnell Douglas Corp. v. Green,
411 U.S. 792 (1973).  See Surrell, 518 F.3d at 1103 (stating
that, "[w[hen analyzing § 1981 claims, we apply the same legal
principles as those applicable in a Title VII disparate treatment
case," and applying burden-shifting framework to Title VII and
§ 1981 claims (citation and quotations omitted)).  Graciano
attempts to meet the McDonnell Douglas test.

Under the McDonnell Douglas framework, Graciano must
establish a prima facie case of discrimination by showing that
(1) she belongs to a protected class; (2) she applied for and was
qualified for the job in issue; (3) despite her qualifications,
she was rejected; and (4) after the rejection, the position was
not filled from the interviewees and the employer continued to
review applicants possessing comparable qualifications.[3]  See

---

[3]This fourth factor is not identical to the one stated in
McDonnell Douglas, as it is widely recognized that the test is a
"flexible one."  See McGinest v. GTE Serv. Corp., 360 F.3d 1103,

McDonnell Douglas, 411 U.S. at 802; Lyons v. England, 307 F.3d

1092, 1112 (9th Cir. 2002); Warren v. City of Carlsbad, 58 F.3d

439, 441 (9th Cir. 1995).  The degree of proof required to

establish a prima facie case for Title VII on summary judgment is

minimal.  See Coghlan v. Am. Seafoods Co., 413 F.3d 1090, 1094

(9th Cir. 2005).  Under the McDonnell Douglas framework, once a

plaintiff succeeds in showing a prima facie case, the burden then

shifts to the defendant to articulate a "legitimate,

nondiscriminatory reason" for its employment decision.  Noyes v.

Kelly Servs., 488 F.3d 1163, 1168 (9th Cir. 2007).  "Should the

defendant carry its burden, the burden then shifts back to the

plaintiff to raise a triable issue of fact that the defendant's

proffered reason was a pretext for unlawful discrimination."  Id.

> **1.   Graciano Does Not Make Out a Prima Facie Case.**

For Title VII purposes, Graciano belongs to a protected

class because she is Puerto Rican and is claiming discrimination

against Puerto Ricans.

---

1122 n.17 (9th Cir. 2004).  In McDonnell Douglas, 411 U.S. at
802, the Supreme Court stated that the fourth factor involved the
issue of whether, "after [an applicant's] rejection, the position
remained open and the employer continued to seek applicants from
persons of complainant's qualifications."  The Supreme Court
noted, however, that the "facts necessary will vary in Title VII
cases, and the specifications . . . of the prima facie proof
required . . . is not necessarily applicable in every respect to
differing factual situations."  Id. at 802 n.13.

Graciano applied for the position of OSP Director.  The position description required the following: "Bachelors Degree in Business Administration, Accounting, Public Administration or equivalent . . . Ability to multi-task in a complex, time sensitive environment[.]  Strong knowledge of federal, state and other applicable regulations[.]  At least five (5) years directly related experience leading a sponsored research office."  ECF No. 27-5.

HPU argues that Graciano was not qualified to be the OSP Director because she lacked a bachelor's degree in Economics, having taken only one economics class and having actually majored in Social Science.  The court agrees that Graciano did not, in fact, have the minimum educational background, as HPU required a "Bachelors Degree in Business Administration, Accounting, Public Administration or equivalent."  ECF No. 27-5.  The court record indicates no dispute that Graciano lied to HPU about her educational background, and that, as a result, she lacked the required education for the position.  <u>See</u> Cooper Decl. ¶ 6 ("a Bachelor's Degree in Social Science was not considered by HPU to be the equivalent to a Bachelor's Degree in Business Administration, Accounting, of Public Administration").[4]

---

[4]A major in "Social Sciences" is, as HPU notes, not equivalent to a major in "Economics," but whether Graciano's actual major (as opposed to her misrepresentations about her major) would have automatically disqualified her is unclear. "Minimum" qualifications may sometimes be waived at an employer's discretion.  However, because Graciano has the burden of making

Even if the court, bending over backwards in Graciano's favor, deemed her to have met the educational requirements, Graciano would still fail to show that she had the minimum qualifications for the position.  She has not shown that she had five years of experience "leading" a sponsored research office, another requirement for the OSP Director position.  <u>See</u> ECF No. 27-5.  Graciano's opposition indicates that she "had ten years of grants management experience in various positions, including running the Division on Addiction at Harvard Medical School."  But Graciano does not even argue that that was a "sponsored research office" that she led.  She therefore raises no triable issue of fact as to whether she had the requisite five years of experience leading a sponsored research office.  Nor does Graciano demonstrate that this requirement was unrelated to the OSP Director position.

The court recognizes that paragraph 29 of the Complaint alleges that Sykes wrote the position description so as to "make it as difficult as possible for Plaintiff to meet the qualifications."  However, for purposes of this motion for summary judgment, no evidence has been cited to that effect.  <u>See</u> Local Rule 56.1(f) ("When resolving motions for summary judgment, the court shall have no independent duty to search and consider

---

out a prima facie case, the court does not here address any possible waiver.

any part of the court record not otherwise referenced in the separate concise statements of the parties.  Further, the court shall have no independent duty to review exhibits in their entirety, but rather will review only those portions of the exhibits specifically identified in the concise statements.").  At best, Graciano argues that she was able to do the job because she did it from the time Sykes resigned until Weeks-Levy was hired.  See Graciano Aff. ¶ 7 ("Upon Ms. Sykes' departure, I . . . was assigned all of Ms. Sykes' responsibilities by John Kearns until Carolyn Weeks-Levy was hired in September of 2009.").  But Graciano's temporary filling of the position does not mean that she was qualified to do the job.  Moreover, there is nothing in the record indicating that, when she was doing the job, HPU thought she was doing the job satisfactorily.

Because Graciano does not demonstrate that she was qualified to be the OSP Director, she fails to make out the minimal prima facie case.  Summary judgment is therefore granted in favor of HPU on the failure to promote claim.

## 2.   Evidence of a Racial Bias is Lacking.

The court cannot help noting that Graciano's evidence of discrimination based on her race is minimal at best.  Even the Complaint, which is not admissible evidence, is sketchy on this point.  For example, the Complaint implies that Clark was stereotyping Graciano as a "lazy Hispanic" when Clark told her,

"When the cat's away, the mice will play" and "Good, then you are finally earning your keep." Complaint ¶ 74. Neither of these alleged statements appears on its face to relate to race, and there is no actual evidence that Clark was calling Graciano a "lazy Hispanic." Graciano's inference that Clark was making that suggestion that is not evidence.

Graciano next says that, in April 2009, Clark told Graciano about a man who had had scorpions living in his dreadlocks. Graciano Aff. ¶¶ 46-47. Graciano indicates that she also had dreadlocks. Opposition at 6 n.2. No reasonable jury could infer from a story about dreadlocks in April 2009 that racial discrimination caused Graciano not to be promoted.

Similarly, Kearns's alleged comment that Mei Wang was Asian and "that's how Asian girls are" fails to show racial animus. First, the context of that comment was that Kearns was explaining to Graciano that Wang was intimidated by Graciano. See Graciano Aff. ¶ 17. Second, this comment does not indicate that Kearns was more likely to hire a white person over someone of Graciano's racial background.

The alleged comments about work ethics, dreadlocks, and Asian girls are, at most, "stray remarks," and no evidence ties them to the failure to promote Graciano. They are such weak circumstantial evidence of racial animus that no reasonable jury could conclude based only on those remarks that HPU was motivated

by racial animus in failing to promote Graciano.  <u>See</u> <u>Nesbit v. Pepsico, Inc.</u>, 994 F.2d 703, 705 (9th Cir. 1993).

HPU argues that the "same actor" inference also applies in this case.  Under that inference, when the same actor is involved in the hiring and adverse employment action, and both actions occur within a short period of time, a "strong inference arises that there was no discriminatory motive."  <u>Bradley v. Harcourt, Brace & Co.</u>, 104 F.3d 267, 270-71 (9th Cir. 1996).  Here, HPU argues that the "same actor" inference should apply because Kearns hired Graciano for the Grants Manager position.  <u>See</u> Cooper Decl. ¶ 5; Plaintiff's Concise statement ¶ 2.  At least according to Graciano's complaint of race discrimination to HPU, Kearns was also the person who hired Weeks-Levy.  <u>See</u> ECF No. 27-10.  If the court accepts Graciano's allegations about who made the decisions in issue, the court may infer that there was no discriminatory motive.

## B.   Count 2--Retaliation.

Title VII's anti-retaliation provision forbids "discriminat[ion] against" an employee who has opposed any unlawful employment practice or who has made a charge, testified, assisted, or participated in a Title VII proceeding or investigation.  42 U.S.C. § 2000e-3(a).  The "elements of a prima facie retaliation claim are, (1) the employee engaged in a protected activity, (2) she suffered an adverse employment

21

action, and (3) there was a causal link between the protected activity and the adverse employment action." Davis v. Team Elec. Co., 520 F.3d 1080, 1093-94 (9ᵗʰ Cir. 2008).

Graciano alleges a prima facie case of retaliation in violation of Title VII. On or about October 9, 2009, Graciano complained to HPU that she had been the victim of race discrimination when Weeks-Levy, a white woman, was hired instead of Graciano. See ECF No. 27-10. Graciano also complained that "Kathy Clark has constantly been going out of her way to try to prove that I am unqualified for my present job." Id. In December 2009, about two months after Graciano had complained about race discrimination, Weeks-Levy "raised concerns about potential misconduct by Graciano, including false accusations . . . that Dr. Sykes had destroyed certain grant files and the failure by Graciano to disclose that a grant-related financial report . . . had been rejected by the funding agency." Cooper Decl. ¶ 16.

After an investigation, Graciano was fired on January 27, 2010. The time between the complaint of discrimination and the initiation of the investigation that led to Graciano's termination, as well as the termination itself, was sufficiently short that it raises an issue of fact as to whether there was a "causal link between the protected activity and the adverse employment action." See Yartzoff v. Thomas, 809 F.2d 1371, 1376

(9th Cir. 1987) ("Causation sufficient to establish the . . .
[causal link] element of the prima facie case may be inferred
from circumstantial evidence, such as the employer's knowledge
that the plaintiff engaged in protected activities and the
proximity in time between the protected action and the allegedly
retaliatory employment decision."); Stucky v. State of Hawaii,
Dept. of Educ., 2007 WL 602105, *5 (D. Haw. Feb 15, 2007) ("A
temporal distance of several months makes a causal link more
difficult to prove; a distance of five years severely undermines
it."); compare Nidds v. Schindler Elevator Corp., 113 F.3d 912,
919 (9th Cir. 1996) (four-month period between protected activity
and layoff was sufficiently close to satisfy the "causal link"
prong), with Manatt v. Bank of Am., NA, 339 F.3d 792, 802 (9th
Cir. 2003) (no causal link inference possible when nine months
separated the protected activity from the adverse employment
action).

     HPU had a legitimate, nondiscriminatory reason for
terminating Graciano.  HPU's EEO investigator, Jan Boivin,
determined that Graciano had lied to Weeks-Levy about Sykes's
destruction of files and about reports that grant documentation
was complete.  See Confidential Memorandum at 9-10 and 13, ECF
No. 27-13.  HPU says that, based on Boivin's findings, it
terminated Graciano.  See Cooper Decl. ¶ 17.  The burden

23

therefore shifts to Graciano to demonstrate that this reason was pretextual.

Graciano, alleging that Boivin's investigation was a sham, questions the validity of Boivin's findings.  Graciano says that Sykes's ability to provide a disk containing electronic copies of some of the "missing" files supports Graciano's claim that Sykes took or destroyed files.  Graciano questions why Sykes had possession of electronic versions of the files when she was no longer working for HPU.  See ECF No. 27-13 at 9.  Instead of explaining how Sykes had the files, Boivin found that Sykes had cooperated in the investigation by providing the files.  Id.  The court agrees that a question of fact as to pretext is raised by Sykes's alleged possession of the "missing" files after she had ceased working for HPU.  A reasonable jury might, based on that evidence alone, view Boivin's investigation as a pretext for terminating Graciano.

No such question of fact is raised by Boivin's findings as to Graciano's misleading of Weeks-Levy about the state of a grant report.  Apparently, the deadline for filing the Federal Financial Award at issue was August 29, 2009.  A delinquency notice was issued via email for the award on November 30, 2009.  On December 1, 2009, Weeks-Levy asked Graciano for documentation concerning the award because Weeks-Levy had received an email indicating that HPU was delinquent in submitting a report.  See

24

Graciano Aff. ¶ 36; ECF No. 27-13 at 10.  Graciano gave Weeks-
Levy an email of August 31, 2009, indicating that submission of
the report was complete, but failed to provide Weeks-Levy with an
email of October 19, 2009, indicating that the award still
required attention.  ECF No. 27-23 at 10.

Graciano says that she did not try to hide the email.
Graciano had forwarded the email of October 19, 2012, to Mei Wang
the same day because Wang had apparently taken over
responsibility for that award.  But that did not relieve Graciano
of the duty to accurately disclose to Weeks-Levy what had
happened with the award.  Even if Graciano simply forgot about
that email, her response to Weeks-Levy was incomplete.  Graciano
shows no pretext based on Boivin's finding that Graciano misled
Weeks-Levy.

Nevertheless, because a question of fact has been
raised as to one of the reasons for terminating Graciano, and
because the record does not establish that Graciano would have
been terminated only for having incorrectly told Weeks-Levy that
a grant report was complete, summary judgment is denied with
respect to the retaliation claim.

### C.   Count III--Public Policy.

Count III of the Complaint asserts that HPU violated
public policy in terminating Graciano on the basis of her race
and in retaliation for having filed a formal complaint of

25

discrimination.  HPU seeks summary judgment on this claim, arguing that Hawaii law does not recognize an independent claim for violation of public policy when the conduct at issue is prohibited by Title VII or chapter 378 of the Hawaii Revised Statutes.  See Hughes v. Mayoral, 721 F. Supp. 2d 947, 962 (D. Haw. 2010) ("Title VII and HRS § 378 expressly prohibit workplace discrimination because of race and/or sex, and courts have found that as a result, a plaintiff cannot state a Parnar claim based on the same conduct.").  Because Graciano concedes that Count III is thus barred, the court does not examine Count III further.  Summary judgment is granted in favor of HPU on Count III.

**V.      CONCLUSION.**

         For the foregoing reasons, summary judgment is granted as to the failure to promote and public policy claims asserted in Counts I and III of the Complaint, but denied as to the retaliation claim asserted in Count II.

         IT IS SO ORDERED.

         DATED: Honolulu, July 24, 2012.



         /s/ Susan Oki Mollway
         Susan Oki Mollway
         Chief United States District Judge

Graciano v. Hawaii Pacific University, Civ. No. 11-00432 SOM/KSC; ORDER GRANTING SUMMARY JUDGMENT WITH RESPECT TO THE FAILURE TO PROMOTE AND PUBLIC POLICY CLAIMS, AND DENYING SUMMARY JUDGMENT WITH RESPECT TO RETALIATION CLAIM